**11 CIV 7964**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

GILLRAY CADET,                                        Civil Action No.:

Plaintiff,

-against-                              **COMPLAINT AND JURY
DEMAND**

DEUTSCHE BANK SECURITIES INC.,
TOMAS DE CASTRO and
STEPHEN CUNNINGHAM,

Defendants.

-------------------------------------------------------------x

*[filing stamp: NOV 7 2011 U.S.D.C. S.D.N.Y. CASHIERS]*

### PRELIMINARY STATEMENT

1.     Plaintiff brings this action for race, color, ethnicity and national origin discrimination, harassment and retaliation with respect to terms and conditions of employment pursuant to 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.*

### JURISDICTION

2.     Jurisdiction is conferred upon the Court by 28 U.S.C. §§ 1331, 1343 and 1367(a).

3.     Venue is proper within the Southern District of New York because the events giving rise to this action occurred within this district.

4.     All conditions precedent to the institution of this suit have been satisfied.

### PARTIES

5.     Plaintiff Gillray Cadet ("Mr. Cadet" or "Plaintiff") is a black male from St. Lucia in the Caribbean who used to reside in this State and district, but who currently temporarily resides in Dubai.

6.     At all relevant times herein, Mr. Cadet was an employee of Defendants.

7.     DEUTSCHE BANK SECURITIES INC. ("DBSI") is a corporation in the business of providing investment banking, capital markets, investment, advisory and other financial services with offices located at 60 Wall Street, New York, NY 10005

8.     Defendant TOMAS DE CASTRO ("Mr. De Castro") was, at all relevant times, a manager and supervisor of DBSI who directed and supervised Plaintiff's work and had supervisory authority over Plaintiff.

9.     Upon information and belief, Mr. De Castro spent much of his youth in South America but he is predominantly of Indian (South Asian) descent.

10.    Defendant STEPHEN CUNNINGHAM ("Mr. Cunningham") is a Caucasian male and was, at all relevant times, a manager and supervisor of DBSI who directed and supervised Plaintiff's work, had hiring and firing authority over Plaintiff and personally made the decision to terminate Mr. Cadet's employment.

## STATEMENT OF FACTS

11.    Defendants hired Plaintiff full time on October 19, 2005, as an Associate of its Corporate Finance Division after Mr. Cadet had completed DBSI's summer internship program.

12.    Plaintiff started working for DBSI in July 2006 and initially spent a number of months in the Associate Development Program working on projects for a variety of groups within Defendants' Corporate Finance Division, including the Latin America Group (the "Latin America Group" or the "Group").

13.    During this training, Plaintiff received positive feedback from a number of his supervisors, including his supervisors on a Latin America project, Sidharta Sinha and Mujeeb Qazi.

14.     On or about February 2007, Plaintiff met with the head of the Latin America Group, Mr. Cunningham, who told Plaintiff that he was impressed with the feedback he had received from Sidharta Sinha and Mujeeb Qazi and with Mr. Cadet's credentials and background.

15.     Mr. Cunningham advised Plaintiff that he liked the fact that he was older than the average Associate, had a strong accounting background (Mr. Cadet is a Certified Public Accountant) and had lived and worked overseas like himself.

16.     At that time, Mr. Cunningham extended an offer to Plaintiff to join the Latin America Group, which Mr. Cadet accepted.

17.     Mr. Cadet joined the Latin America Group in or about March 2007 as its sole first year Associate under the direct supervision of Mr. De Castro, the then Director of the Group.

18.     Until this time, Plaintiff had not worked with or for Mr. De Castro who joined DBSI in early 2007 and who was not at all involved in Plaintiff's hiring or offering him a position in the Latin America Group.

19.     Soon into Mr. Cadet's transfer to the Latin America Group, Mr. De Castro started to discredit and undermine Plaintiff.

20.     For example, Mr. De Castro targeted and harassed Plaintiff, scrutinized his expenses beyond protocol, unfairly criticized Plaintiff to Mr. Cunningham and others and also unfairly downgraded his work performance reviews.

21.     Mr. De Castro's campaign to sabotage Plaintiff's career at DBSI not only affected his compensation and bonuses but also his entire reputation and standing within DBSI as well as his mental well-being.

22.     As outlined below, there is direct evidence that Mr. De Castro's harassment and discrimination against Plaintiff was racially motivated, including certain racist comments that Mr. De Castro stated directly to Plaintiff about him and black people in general.

### Despite His Excellent Work Performance, Mr. Cadet Receives a Much Lower Annual Bonus for 2007 Than His Fellow Associates

23.     Plaintiff's work performance in the Latin America Group was excellent throughout his employment and he received excellent feedback from supervisors, except from Mr. De Castro.

24.     In particular, Mr. Cunningham was always suitably impressed by Mr. Cadet's work and stated on several occasions that he and the Deutsche Bank colleagues in Chile all agreed Mr. Cadet was doing an "excellent job."

25.     Plaintiff was predominantly assigned to Defendants' mergers & acquisitions projects in Chile.

26.     Plaintiff's first review in 2007 since joining the Latin America Group largely reflected this good work performance.

27.     Plaintiff was given the highest rating - "far exceeding expectations" - in 16 of 31 areas in his 2007 appraisal.

28.     In the remaining 13 areas Mr. Cadet received the next best rating, "exceeds expectations," except in 2 of 31 areas where his performance was rated as having "met expectations."

29.     However, and despite these excellent scores, Mr. De Castro's unfairly downgraded Mr. Cadet's overall performance scores.

30.     While Plaintiff's annual performance was appraised by 10 reviewers in each area of competence, Mr. De Castro was solely responsible for providing Mr. Cadet's overall or "final" score in each of the 31 areas.

31.     While the overall score was supposed to reflect the ratings provided by the 10 reviewers, which was the established practice within DBSI, Mr. De Castro downgraded Plaintiff's scores substantially that did not reflect the reviewers' individual ratings.

32.     For example, there were several areas where Mr. De Castro assigned Plaintiff an overall "4" or "exceeds expectations" when almost all or most of the 10 reviewers had rated Plaintiff a "5" or "far exceeding expectations" in that particular area.

33.     Similarly, Mr. De Castro gave Plaintiff an overall "3" or "met expectations" rating in two areas when the majority of the other evaluators had rated Mr. Cadet a "4" or "5" in those areas.

34.     Mr. De Castro would also request reviewers' comments and performance ratings for Mr. Cadet in draft form and edit them before they were officially submitted to make them less favorable and Mr. De Castro did this at times with Mr. Cadet present.

35.     Despite Mr. De Castro's concerted efforts at downgrading Plaintiff, the comments by Plaintiff's reviewers in his 2007 appraisal largely reflected Plaintiff's good work performance.

36.     For example, his reviewers stated about Plaintiff: "***Great leader*** … excellent communication; stubbornness for learning; technically very good, especially with his knowledge of accounting; great attitude."

37.     Another reviewer wrote that Mr. Cadet "demonstrated excellent interpersonal skills and a willingness to make valuable contributions. He also has proven to be an

excellent team player working well with other members of the Group. He is very responsive and supportive and eager to work hard."

38.     Another stated, "Gillray did an exceptional job on everything he worked on with us during his year in the ADP."

39.     Other comments included, "I...was impressed with the quality of his work on this project. He did a very thorough and competent job and the client was very happy with the result of his efforts"; "Gillray is a team player and well liked...Several deal team members have commented to me that they enjoyed working with Gillray"; and "very detailed-oriented, great team player, great communication skills, hard worker and great attitude."

40.     As part of the review process in 2007, Mr. Cadet met with Mr. De Castro on three occasions and with Mr. Cunningham on two occasions.

41.     During these meetings, Mr. De Castro and Mr. Cunningham were complimentary about Plaintiff's work and neither mentioned any specific issues or concerns.

42.     Mr. Cadet asked Mr. De Castro, however, in each of their three performance review meetings why he had downgraded his performance scores in numerous aspects that had severely affected Mr. Cadet's overall score.

43.     Mr. De Castro refused to adjust Plaintiff's scores and claimed that his lower overall scores would not impact Mr. Cadet's annual bonus and to not "worry about it."

44.     On the contrary, and despite Mr. De Castro's assurances, Plaintiff's lowered performance scores resulted in him being awarded a year-end bonus of $115,000 for 2007.

45.   This confirmed that Plaintiff's lowered performance scores were the most critical factor in determining bonuses.

46.   Plaintiff's low bonus was also, upon information and belief, a result of Mr. De Castro's failure to advocate for a higher bonus on Plaintiff's behalf to DBSI's Compensation Committee.

47.   Plaintiff's annual bonus was far lower than his peers, the associate class of 2006.

48.   During an informal meeting, Mr. Cadet and his fellow Associates wrote the amount of their year-end bonus for 2007 anonymously on pieces of paper and placed them in a bag.

49.   From this process, Plaintiff discovered that the range of bonuses awarded in 2007 to the DBSI Associate class of 2006 was $155,000 to $245,000, i.e., an average of $215,000, therefore far more than was awarded to him.

50.   When Mr. Cunningham disclosed the bonus amount to Plaintiff he cited, for the first time, certain performance "issues" in a transparent attempt to justify why Plaintiff's bonus was very low.

51.   These so-called "issues" were very vague and non-specific except for one example that Mr. Cunningham provided which sought to blame Mr. Cadet for a delay in a project despite knowing full well that the delay was caused solely by the client failing to provide the necessary information in a timely manner.

52.   Plaintiff met with Mr. Cunningham a second time to ask him to specify the alleged "performance issues."

53.   In response, Mr. Cunningham said that he could not really provide any specifics and he conceded that any critiques about Plaintiff's performance had been solely brought

to his attention by Mr. De Castro and that no other manager, client or Associate had had anything negative to say about Plaintiff's performance.

54.     Mr. De Castro had never raised any serious concerns about Plaintiff's work with Mr. Cadet directly.

55.     The fact that he was criticizing Plaintiff's work performance unfairly to Mr. Cunningham confirmed Mr. Cadet's fears that Mr. De Castro was unfairly targeting him.

56.     After meeting with Mr. Cunningham, Plaintiff asked the managers and employees with whom he worked for informal feedback and none had anything negative to say about his work.

### Evidence that Mr. De Castro's Discrimination Against Plaintiff Was Racially Motivated.

57.     Mr. De Castro demonstrated his antipathy towards Plaintiff in numerous other ways.

58.     During the summer of 2008, an analyst in the Group told Plaintiff to "watch [his] back" because Mr. De Castro talked "badly" about him when he was not around.

59.     In the summer of 2008, after returning from a trip to Chile, one of Mr. Cadet's colleagues informed him that Mr. De Castro had broadcast to all the analysts that being assigned to projects in Chile was a poor reflection on that individual within the Latin America Group and is a strong indication that "the Group" does not think highly of that individual.

60.     Clearly this comment was directed at Plaintiff as at the time he was the only person from the New York team working in Chile.

61.     The Deutsche Bank Chile office was known to be problematic and Mr. Cunningham and Mr. De Castro both experienced many issues with this office.

62.     Plaintiff learned of Mr. De Castro's comments about his assignment to Chile, he complained about it to Mr. Cunningham also telling him that Mr. De Castro was intentionally making his life difficult.

63.     Mr. Cunningham deflected Plaintiff's concerns and merely told Plaintiff to ignore Mr. De Castro.

64.     At this time, Plaintiff also complained that Mr. De Castro was not assigning Plaintiff to certain interesting projects, even those that Plaintiff was instrumental in acquiring for the Group.

65.     Within DBSI, it was common practice that the team that prepares and pitches a deal which is eventually mandated will be typically assigned to execute that deal.

66.     In Plaintiff's case, however, and without basis, Mr. De Castro excluded Plaintiff from teams assigned to execute deals even when Plaintiff was instrumental in pitching those deals successfully.

67.     Mr. Cunningham failed to give a concrete response and said he would simply discuss the matter with Mr. De Castro but to no avail and Mr. De Castro continued to exclude Plaintiff from many interesting deals.

68.     Mr. De Castro often unfairly berated Plaintiff for relatively innocuous incidents or manipulated events to place Mr. Cadet in a false bad light.

69.     For example, in January 2009, Mr. De Castro assigned Plaintiff a project that required the support of an Analyst.

70.     Plaintiff emailed Mr. De Castro asking whether he could assign an Analyst to work with him and provided good reasons.

71.     It was group policy to make staffing requests to Mr. De Castro, who acted as Staffer for the Latin America Group.

72.     Mr. De Castro denied Plaintiff's request for an Analyst despite knowing the exigent demands of the project in question by falsely claiming there were no Analysts available to help Mr. Cadet with the project.

73.     In fact, several Analysts had already told Plaintiff they were available to help with the project.

74.     Plaintiff later learned from someone in the Group that Mr. De Castro had one of his favorite analysts at his desk reviewing his email exchange with Plaintiff, and then stated, "I always win" after Plaintiff wrote that he would perform the assignment without the necessary support.

75.     In 2008, Mr. De Castro unfairly accused Mr. Cadet of planning to stay in Peru for the weekend to "hang out" after Mr. Cadet extended his due diligence trip in Peru to depart on Friday night instead of Thursday night.

76.     Mr. De Castro took the opportunity to berate Plaintiff despite knowing full well that one of DBSI's Chilean clients had specifically asked Plaintiff to extend his stay in Lima for one day to conduct more due diligence by visiting some more stores of a company that the client was considering acquiring.

77.     In fact, Plaintiff was eager to get back to New York to see his ailing mother who was visiting from St. Lucia and had fallen ill while he was away.

78.     When Plaintiff returned home, he had to take his mother to the emergency room where she was admitted to the hospital for a few days.

79.     Mr. De Castro routinely allowed less senior Group members than Plaintiff to prolong their trips into the weekend after completing business or travel the weekend before their official business without incident or negative comment.

80.     As stated above, many of Mr. De Castro's comments towards Plaintiff were clearly racist in nature.

81.     For example, in or about January 2008, during a dinner at work with Mr. De Castro, the other Associate and Analysts in the Group and Plaintiff, the subject of race and ethnicity came up.

82.     Mr. De Castro lead the conversation and identified the various ethnicities and races in the Group, such as "Koreans," "Indians," "Jews" and "Caucasians."

83.     When referring to Blacks and African-Americans, however, Mr. De Castro pointed at Plaintiff, raised his clenched right fist, mimicking the gesture of the Black Power movement, and smirked.

84.     In January 2009, during a discussion Plaintiff was engaged in about the upcoming Martin Luther King, Jr. national holiday with the two assistants in the Group, Mr. De Castro approached and stated in a very condescending and disgusted tone, "It is a holiday for *some* people" before walking away.

85.     After Mr. De Castro left, one of the assistants commented to Plaintiff that she did not like the "tone" of Mr. De Castro's comment.

### Plaintiff's Year-End Bonus for 2008 Was Again Much Lower Than His Peers

86.     Despite the ongoing harassment at Mr. De Castro's hands, Plaintiff's performance review for 2008 was good.

87.     Plaintiff's eight reviewers awarded him the highest rating of "5" ("far exceeding expectations") in 9 of 17 areas of competence and in the remaining 8 areas he was rated the next highest rating of "4" ("exceeds expectations").

88.     But again, just as he had done in 2007, Mr. De Castro downgraded Plaintiff's overall score in most areas.

89.     For example, Mr. De Castro gave Plaintiff an overall "4" rating in 3 categories where most of his eight reviewers had scored his performance a "5".

90.     Again, because of Mr. De Castro's systematic downgrading of Plaintiff's overall scores, the most critical factor in determining bonuses, Plaintiff's year-end bonus for 2008 was a mere $65,000.

91.     Upon information and belief, Mr. Cadet's peers all received year-end bonuses above $100,000 for the year 2008.

92.     Plaintiff's bonus was not commensurate with his actual work performance, which remained at a very high level as reflected in the reviewers' comments.

93.     For example, Plaintiff's reviewers, except Mr. De Castro, made the following positive comments in his performance review for 2008: "Gillray has been able to play key roles in executing transactions, *well beyond what is normally done by an associate*. He has shown leadership and teamwork throughout this year, and has always taken on any challenges that he encounters" and "Gillray has been instrumental in pushing forward Deutsche Bank's corporate finance and M&A franchise in Chile, which lost an important MD this year."

94.     Other reviewers confirmed Plaintiff's key role within the Group, such as "he has been the primary banker for all aspects of the execution. He has worked on several other

transactions in Chile including several buyside mandates with Ripley. Each time, Gilray has performed in an outstanding fashion" and "[b]eing the only associate in the Latin America Group, Gilray's impact on the business is significant. Gilray has been working on M&A assignments in Chile where he had to step up and play a major role in advising our clients. His dedication, excellent communication skills and great attitude make him a core member of the team."

95.     In fact, many of the comments indicated that the reviews thought that Plaintiff should be on track to be promoted to a Vice President position at the end of 2009, the next promotional level for all Associates.

96.     For example, one reviewer wrote: "Besides playing a role in execution, Gillray has shown his commitment to playing a coverage role for the clients he has worked with. This shows determination and development on the part of an Associate, and broadens the skill set that will help Gillray in his efforts to become a VP" and "[h]e is also clearly determined to develop all the skills required to be a successful banker."

### Mr. De Castro's Harassment Takes Its Toll on Plaintiff's Health Prompting Mr. Cadet to Resign

97.     Mr. De Castro's harassment and undermining of his efforts caused Plaintiff much stress and anxiety and his health suffered as a result.

98.     In March 2009, Plaintiff underwent counseling due to the work stress caused by Mr. De Castro's conduct.

99.     During 2009, Plaintiff made the difficult decision to resign because of the stress caused by Mr. De Castro's harassment.

100.    The decision to resign was taken reluctantly as Plaintiff enjoyed his work and worked well with most of his co-workers and managers and his goal was to become a VP.

101.   In addition, Plaintiff had not secured another job when he made the decision to resign.

102.   On Monday, March 2, 2009, Plaintiff met with Mr. Cunningham and told him that he was resigning due mostly to Mr. De Castro's harassment.

103.   Mr. Cunningham replied that Plaintiff needed to "let things go" and "leave things in the past."

104.   Mr. Cunningham asked Plaintiff which new job he had obtained and Mr. Cunningham was extremely surprised to learn that Plaintiff had not secured a new job.

105.   Mr. Cunningham then told Plaintiff that he was doing good work for the Latin America Group and was making significant strides in his development as a banker.

106.   Mr. Cunningham reiterated the excellent feedback he had received about Plaintiff from his DBSI Chile colleagues with whom Plaintiff worked for most of 2008.

107.   Mr. Cunningham asked Mr. Cadet to think very carefully about whether he was doing the right thing in resigning, especially given the difficult job environment in a recession.

108.   Mr. Cunningham asked Plaintiff to consider his decision overnight and to meet with him the following day.

109.   The following day, Plaintiff met Mr. Cunningham in his office and reiterated his desire to resign.

110.   After a period of silence, Mr. Cunningham responded by asking Plaintiff when he wanted his last day at DBSI to be, to which Plaintiff responded that he wanted two weeks to give him time to see his doctors and get his annual check-ups while he still had medical insurance.

111.    Mr. Cunningham agreed.

## Plaintiff Complains to Defendants' HR Department About De Castro's Racial Harassment and Discrimination

112.    Within a day, Plaintiff met with Jennifer Itskovich, Respondent's HR Manager, for an "exit" interview.

113.    During the interview, Mr. Cadet explained to Ms. Itskovich that he was resigning because Mr. De Castro had been harassing him and making his life difficult for a very long time and that his work environment had become "unbearable."

114.    Ms. Itskovich asked Plaintiff to cite examples of what Mr. De Castro had been doing.

115.    Plaintiff cited various instances of harassing behavior and included the racially offensive and insensitive comments, including Mr. De Castro's comments about Martin Luther King Day and the Black Power gesture during the work dinner.

116.    Ms. Itskovich asked Plaintiff whether he believed that Mr. De Castro's conduct were acts of discrimination, to which Plaintiff replied, "Yes, I do feel that he is discriminatory towards me."

117.    Ms. Itskovich then asked Plaintiff why he had not complained to HR about the discrimination prior to that meeting as part of HR's role was to handle such issues.

118.    Mr. Cadet explained to Mr. Itskovich that he had not complained previously as he was afraid of losing his job or being retaliated against in other ways.

119.    Ms. Itskovich responded that Mr. Cadet was raising "serious issues" about his supervisor, which would need to be dealt with by the HR Department.

120.    Ms. Itskovich genuinely appeared to feel sorry and empathetic towards Plaintiff and suggested that he seek counseling under DBSI's medical program.

121.    Given her sympathetic tone and comments, Plaintiff told Ms. Itskovich he wanted to retract his resignation.

122.    Ms. Itskovich replied that Mr. Cadet would have to talk to Mr. Cunningham if he wanted to rescind the resignation.

123.    Within an hour of meeting Ms. Itskovich, Mr. Cunningham called Plaintiff to say that Ms. Itskovich had spoken to him about her meeting with Plaintiff and that she had notified him that Mr. Cadet wanted to discuss a matter with him.

124.    Mr. Cadet stated to Mr. Cunningham that given the discussion he had with Ms. Itskovich and her feedback on how to best deal with the issues he had been facing, he had decided to retract his resignation.

125.    Mr. Cunningham proceeded to laugh and asked Plaintiff whether Ms. Itskovich had said whether she would help him transfer to another group as he had resigned from the Latin America Group.

126.    Plaintiff replied that they had no discussions about transferring to another group.

127.    The next day, Mr. Cunningham and Ms. Itskovich met Plaintiff in Mr. Cunningham's office and advised Mr. Cadet his resignation could not be retracted as the exiting process had already begun.

128.    Moreover, no mention was made of transferring to another group.

129.    In response, Plaintiff stated that he would pack his things and leave that day as it clear that he was no longer welcome in the Group.

130. In truth, Mr. Cunningham refused to reinstate Plaintiff because he had complained the day before about Mr. De Castro's discrimination and harassment.

131. Hence, the decision to refuse to allow Plaintiff to retract his resignation was motivated for retaliatory reasons.

## Plaintiff Files a Complaint of Discrimination and Retaliation With the State Division of Human Rights.

132. Subsequently, Plaintiff filed a complaint with the State Division of Human Rights ("SDHR complaint") asserting race discrimination and retaliation claims.

133. In response to Plaintiff's SDHR complaint, Defendants asserted for the first time that they decided not to reinstate Plaintiff as it was unlikely that he was going to be promoted to the next level as they questioned his judgment.

134. DBSI claimed that it questioned Plaintiff's judgment due to innocuous incidents occurring in 2007 and well before Plaintiff's separation, namely that Plaintiff had spent excessively while entertaining DBSI summer interns in August, 2007 and certain car ride expenses incurred by Plaintiff in 2007.

135. Finally, DBSI claimed that Plaintiff had complained about his work assignment to Chile as further evidence of his unsuitability for his job and for a promotion.

136. These reasons are merely pretextual and excuses for the underlying impermissible motives.

137. Because Mr. Cadet's work performance was good, DBSI had no option but to justify their discriminatory practices by dredging up innocuous incidents that occurred almost two years prior to Plaintiff's separation.

138. An explanation of each issue raised will further highlight this.

139. Regarding the outing with the summer interns, which occurred in August, 2007, Mr. De Castro instructed Plaintiff to take the Group's summer interns on an outing to a New York Mets baseball game and for dinner.

140. Accompanying Plaintiff on this trip were three full-time Analysts in the Group, Uri Magen-David, Hunter Kushner and David No.

141. Mr. De Castro told Plaintiff that DBSI would reimburse him for the entire evening and to keep the receipts.

142. The following day, Plaintiff met with Mr. De Castro to inform him that after dinner the group went to a lounge in the Meat Packing District and asked Mr. De Castro how much of the expenses he and the analysts could submit for reimbursement.

143. Plaintiff communicated that they had spent a total of $1900 for the entire outing of eight people and that he and two of the Analysts (David No and Uri Magen-David) were fully prepared to pay for the expenses incurred at the lounge bar, which accounted for about half the bill.

144. Mr. De Castro immediately told Plaintiff to "go ahead" and submit the expenses for reimbursement.

145. Plaintiff asked Mr. De Castro if he was sure that Plaintiff should submit the entire amount to seek reimbursement, to which Mr. De Castro responded "yes."

146. Subsequently, in October 2007, Defendants reimbursed Plaintiff only $878 of the total bill expended on the summer interns and Plaintiff and the two Analysts suffered the difference without complaint.

147.    These entertainment expenses was a minor incident that was never brought up again during Plaintiff's tenure and was only raised after Plaintiff filed his complaint with the SDHR almost two years later.

148.    The fact that Mr. Cadet's supervisors did not even mention this expense issue two months later in his 2007 performance appraisal further belies the fact that it was considered a minor issue.

149.    Secondly, DBSI also claimed to the State Division that it questioned Plaintiff's judgment because he had "repeatedly violated DBSI's policies regarding private car services, using the cars to make multiple stops on [my] way home from work for non-business purposes."

150.    This is another pretextual reason.

151.    In fact, DBSI's policy permitted employees who work late to take a car home.

152.    In 2007, when Plaintiff worked until very late he would occasionally ask the car to make one stop on his way home to pick up his then girlfriend, now current fiancée.

153.    The car was not required to do any detours as Mr. Cadet's girlfriend lived on the way to his apartment.

154.    Also, on occasion Plaintiff asked the driver to briefly stop at the grocery store along the route home while he bought a few items.

155.    The cost of these stops was an additional five dollars per stop, which Plaintiff would pay the driver immediately in cash.

156.    In 2008, Mike Vigliotti, the Chief Accounting Officer for the Group, asked Plaintiff about his car rides home and why he made stops at the same interaction (14th Street and 8th Avenue) en route to his final destination.

157. Plaintiff explained that the stops were brief ones en route to his apartment to pick up his girlfriend late at night (who would wait on the corner) or to pick up a few groceries.

158. Plaintiff stated that he was under the impression that DBSI's car ride policy permitted one stop and that he always reimbursed the drivers in cash for these stops when the drivers actually had to wait so there was no loss to DBSI.

159. Mr. Vigliotti informed Plaintiff that DBSI's car ride policy did not allow any stops and that the drivers were still billing DBSI for the stops.

160. Plaintiff subsequently discovered that drivers had forged his initials for stops Plaintiff paid for in cash.

161. Plaintiff apologized for the misunderstanding and that he would immediately reimburse DBSI for any stops made to date.

162. Plaintiff subsequently emailed Mr. Vigliotti stating that he had calculated the total cost of the stops at approximately $300 over a year and asked him how he should reimburse DBSI.

163. Mr. Vigliotti never responded to this email despite a subsequent follow up by Plaintiff.

164. In fact, it was common practice in the Latin America Group and throughout DBSI to request stops, even those that required long detours, or to use the car service for personal trips such as to the airport, and it usually never raised an eyebrow.

165. Finally, DBSI claims that it would not have promoted Plaintiff due to his "complaints about being staffed on the Chile assignment" is false.

166.    Plaintiff enjoyed his work in Chile and had no complaints about being assigned to projects there and to this day still maintains contact with colleagues in Chile.

167.    On the contrary, it was Mr. De Castro who indicated to members of the Group that because he had assigned Mr. Cadet to projects in Chile this reflected poorly on Plaintiff.

168.    Defendants also asserted in its State Division response statement that "Mr. De Castro also received complaints from some of the analysts that Mr. Cadet was giving them too much work, or was delegating work to them that was not appropriate for them to do" or that was "too challenging for them."

169.    This pretextual excuse is belied by the many comments in Mr. Cadet's two annual reviews extolling his leadership and mentoring virtues.

170.    The work that Mr. Cadet assigned the Interns and Analysts was commensurate with the level required of all trainees and Analysts in the demanding and competitive industry of investment banking and was concordant with the level of exposure specifically requested by Mr. De Castro of the interns.

171.    For example, in June 2008, Mr. De Castro urged Plaintiff to provide the summer Analyst Interns with as much experience as possible and to involve three of the four Interns in the two "live deals" that Mr. Cadet was then managing in Chile.

172.    Moreover, all the interns who worked with Mr. Cadet reported that they were very happy with the modeling and live deal exposure that Plaintiff was providing them and that many of their fellow Interns in other groups were not getting this depth of experience.

173.    In fact, even Mr. De Castro wrote in one of Plaintiff's appraisals that he needed to "delegate more."

### Conclusion

174.    Defendants targeted, unfairly berated and undermined Plaintiff throughout his employment.

175.    Defendants downgraded Plaintiff's performance appraisals, denied him bonuses commensurate with his abilities and work performance and refused to provide Plaintiff with advancement opportunities and mentoring because of his race and ethnicity.

176.    Finally, in refusing to allow Plaintiff to retract his resignation a mere two days after tendering it was motivated in retaliation for his complaints of race discrimination and harassment against Defendant De Castro.

177.    The actions stated herein were discriminatory in that they were motivated because of Plaintiff's race, ethnicity and in retaliation for Plaintiff having opposed that discrimination.

178.    The actions complained of herein were committed intentionally by Defendants and constitute a continuing policy and practice of discrimination.

179.    The various violations of law which are alleged herein were committed intentionally and/or willfully by Defendants.

180.    Mr. Cunningham aided, condoned and abetted Mr. De Castro's discrimination and retaliation against Plaintiff by refusing to reinstate Plaintiff.

181.    Defendants' actions have caused Plaintiff great emotional distress, humiliation and financial hardship.

## FIRST CAUSE OF ACTION: SECTION 1981

182.    The allegations in the preceding paragraphs are repeated here as if fully stated.

183.    Defendants intentionally retaliated against and discriminated against Plaintiff on the basis of his race and color in violation of Section 1981.

184.    Defendant Cunningham was personally involved in the retaliation through his direct participation and for the discrimination through his negligent supervision of Defendant Mr. De Castro.

185.    Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $500,000.

## SECOND CAUSE OF ACTION: TITLE VII

186.    The allegations of the preceding paragraphs are repeated here as if fully stated.

187.    DBSI intentionally discriminated against Plaintiff on the basis of his race and ethnicity.

188.    DBSI also retaliated against Plaintiff for his protected activity.

189.    Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $500,000.


WHEREFORE, Plaintiff demands that judgment be granted as follows:

    A.  The amount sought for each cause of action;

    B.  Liquidated damages;

    C.  Punitive damages; and

    D.  Attorneys fees and costs.

Dated:     New York, New York
           November 7, 2011

                              LAW OFFICES OF IAN WALLACE, PLLC

           By:     _____
                   Ian F. Wallace (IW: 3100)
                   *Attorney for Plaintiff*
                   501 Fifth Avenue – 19th Floor
                   New York, N.Y. 10017
                   (212) 661-5306